Huey Richard Mordecai was convicted by a jury of assault in the first degree, a violation of § 13A-6-20, Ala. Code 1975. He was sentenced as a habitual felony offender to 20 years' imprisonment. We reverse.
The evidence at trial tended to establish the following. Mordecai and the victim, Larry Garrigan, were regular customers at a small bar located in Birmingham. Two or three weeks before this incident took place, Mordecai made a flippant sexual remark to a female patron, Lisa. Lisa told Garrigan about the remark and allegedly asked Garrigan if he would speak to Mordecai about the comment. Garrigan testified that he asked Keith Cowherd, a friend of Mordecai's, to speak to Mordecai about the remark he made to Lisa. He acknowledged that he might have told Cowherd that he wanted to talk to Mordecai about what he had said to Lisa.
Garrigan testified that he went to the bar on the afternoon of October 20, 2000, and that Mordecai was already inside the bar. He said that Mordecai yelled across the room, "I understand you want to talk to me." (R. 87.) Garrigan told Mordecai that he wanted to talk, and he suggested they go outside. Garrigan said that Mordecai denied making any sexual advances toward Lisa, and he told Mordecai that when Lisa came to the bar later that day, he would talk to her about it. Garrigan then left the premises, and returned approximately 15 minutes later.
Garrigan testified that, when he returned to the bar, Mordecai was playing pool with another man. Garrigan said that he sat at the bar, and his back was to the pool table. He testified that he heard Mordecai say something like, "You been wanting some of me?" (R. 91.) Garrigan said that he turned his head, and Mordecai hit him across the eye and nose with a pool cue. Mordecai then began hitting him with his fists, Garrigan said. Garrigan said that he grabbed Mordecai and "kind of picked him up and throwed [sic] him on the ground." (R. 92.) He admitted that he lifted Mordecai up in the air and that Mordecai's feet were off the ground before he threw him to the floor. Garrigan held Mordecai down on the floor until Keith Cowherd broke up the altercation. Mordecai then left the bar. As a result of the fight, Garrigan suffered injuries to his eyes and broken bones in his face. His right eye was surgically removed. He did not initially give police the information that would identify Mordecai, but he did so within one month after the assault occurred.
The bartender, Larry Latham, testified that the bar is small, and he agreed with the description of it as "a hole-in-the-wall bar." (R. 158.) Latham said that, when Mordecai entered the bar on the day of the assault, he told Mordecai, "Keith Cowherd told me to watch out for Larry Garrigan; that he was going to jump on [Mordecai]." (R. 164.) Latham said that he later heard what sounded like a fistfight and "hollering," and when he turned to look, he saw Garrigan and Mordecai on the ground. *Page 995 
Keith Cowherd testified that, when he entered the bar on the afternoon of the incident, Garrigan and Mordecai were already at the bar. When he saw Mordecai, who was playing pool, Cowherd said to him, "There is Garrigan. You know, you better watch out," because the bartender had been telling him that Garrigan was going to "get" Mordecai for making the provocative statement to Lisa. Cowherd had been telling Mordecai for approximately two weeks that Garrigan was going to "get" him. Cowherd said that he walked away from Mordecai and was playing the slot machine when he heard a commotion. When he turned around, he said, he saw Garrigan on top of Mordecai, and both men were bleeding. The people in the bar asked him to break it up, and he grabbed Garrigan, but could not separate them, so he "laid them back down." (R. 182.) Cowherd said "finally they quit," and he used Mordecai's torn shirt to help the men wipe their faces. Mordecai left the bar, and told Cowherd to keep Garrigan from chasing after him.
Robert Brazeal testified that he had heard rumors in the bar that Mordecai had "better watch himself" because Garrigan was looking for him. (R. 215.) Garrigan is a much bigger man than Mordecai, he said. Brazeal was playing pool with Mordecai before the fight occurred. He said that his back was turned to Mordecai and Garrigan as he made a play at the pool table, and he heard a "ruckus." When he turned around, he saw Garrigan on top of Mordecai on the floor. Cowherd intervened, and the two men got up.
Reeves Cowherd testified that, on the day of the incident, Garrigan spoke to him in the parking lot. Garrigan asked Reeves if he knew Mordecai, and told him what Mordecai had said to Lisa. Reeves told Garrigan that Mordecai had probably been kidding, but he said that Garrigan responded, "`I don't care whether he was kidding or not. I am going to beat his ass for saying it.'" (R. 237.) Reeves said that when he entered the bar, he told Mordecai to watch out for Garrigan because he had told Reeves that he was going to "whoop his ass." (R. 238.) Reeves said that he later saw Mordecai and Garrigan outside the bar. They talked, shook hands, and returned to the bar. The witness's perception was that the two men had resolved the issue regarding Lisa. Reeves left the bar before Mordecai and Garrigan fought.
Richard Mordecai testified in his defense. He acknowledged making a sexual remark to Lisa two or three weeks before this incident occurred. He said he meant it as a joke, and he believed that Lisa did not think anything about the remark, either. Mordecai said that, when he entered the bar on October 20, Larry Latham took him aside and warned him to watch Garrigan. Latham told Mordecai that Garrigan "`says that he is going to kick your ass, has been looking for you because of what you said to Lisa.'" (R. 249.) Mordecai told Latham that he would talk to Garrigan about what he had said to Lisa, and they would get the matter settled. Latham told Mordecai to watch Garrigan because he was dangerous. Mordecai said that Reeves Cowherd then came into the bar and told him that Garrigan was outside the bar and had just said that he was going to "whoop" Mordecai. Mordecai told Reeves that he would talk to Garrigan about what he had said to Lisa; Reeves, like Latham, warned Mordecai to watch Garrigan because he was dangerous.
Mordecai said that, soon after Garrigan came into the bar, he told Garrigan that he had heard that Garrigan was concerned about what he had said to Lisa, and that there had been nothing to the remark. Garrigan suggested they go outside to *Page 996 
talk, and Mordecai agreed. Robert Brazeal told Mordecai to watch Garrigan. Mordecai said that he explained the incident involving Lisa, and told Garrigan that Garrigan was not married to Lisa and that Lisa's boyfriend was not angry about the remark. Garrigan told him that he was a friend of Lisa's, and that Mordecai should not have made the remark. Mordecai said he had meant nothing by it, and told Garrigan that he did not want any problems. Garrigan told Mordecai that he was not seeing Lisa anymore, and that he did not care. Mordecai believed that the discussion had resolved the issue between them, and he returned to the bar and began playing pool.
Garrigan entered the bar later, and he sat near the pool table. Mordecai said that Keith Cowherd came up to him and warned him that Garrigan was about to "get" him. Mordecai told Cowherd that he had already spoken to Garrigan and that they had resolved the issue. Cowherd told Mordecai, "`No, watch him.'" (R. 260.) Mordecai testified that he turned to look at Garrigan and when he did, Garrigan lunged at him with his fist "rared back," ready to strike Mordecai. (R. 261.) Mordecai said that he swung at Garrigan, and Garrigan swung at him. When defense counsel asked Mordecai if he swung at Garrigan to protect himself, Mordecai testified, "Well, yes, sir. Natural instinct. And, you know, I had been scared — I had been threatened. I was in imminent danger." (R. 262.) Mordecai was holding the pool cue when Garrigan attacked him, he said, and when he swung at Garrigan, he hit him in the face with the cue.
Mordecai said that Garrigan hit him in the face with his fist at approximately the same time he hit Garrigan. Immediately after the initial blows were struck, Mordecai said, due to Garrigan's size, height, and weight, they ended up on the floor, and Garrigan was on top of him. After they got up from the floor, he wiped his face and walked out the back door. He told Keith Cowherd to be sure that Garrigan did not follow him.
Mordecai testified that he struck Garrigan only in self-defense, and that if someone was coming at him and struck him, he would strike back. He further stated that, given the configuration of the bar, he could not have avoided Garrigan after Garrigan lunged at him. Mordecai repeated on cross-examination that he swung at Garrigan to protect himself when Garrigan came at him.
During the jury charge conference, the trial court stated that it would not give the self-defense instruction requested by the defense. Defense counsel argued that, under the circumstances, the self-defense instruction was mandated, because Mordecai had asserted that he was defending himself against the attack of a larger man who was swinging a fist at him. Defense counsel further noted that Mordecai's testimony established that he was afraid of Garrigan. The prosecutor stated that she opposed the self-defense instruction because the undisputed testimony in the case was that Garrigan was unarmed. Defense counsel later asked the trial court to reconsider his request for a self-defense instruction, and stated that case law held that if an unarmed person strikes a person who is armed, the aggressor takes the victim as he finds him, and the victim has a right to defend himself. The trial court again declined to give the jury charge on self-defense. The jury returned a guilty verdict. This appeal follows.
Mordecai contends that the trial court erred to reversal when it denied his requested jury instruction on self-defense. We agree. *Page 997 
Section 13A-3-23, Ala. Code 1975, provides, in pertinent part:
 "(a) A person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for the purpose."
Judge Bowen, writing for this Court in King v. State, 478 So.2d 318
(Ala.Crim.App. 1985), set forth the oft-repeated rules regarding a trial court's obligation to charge a jury on self-defense when the evidence presents the claim:
 "The general rule is that `every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.' Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978). If there is `any evidence, however slight, tending to support' that the defendant acted in self-defense, the issue should be submitted to the jury. King v. State, 71 Ala. 1, 4 (1881). In most cases, the issue of self-defense is one of ultimate fact solely for determination by the jury, Domingus v. State, 94 Ala. 9, 11 So. 190
(1892), however `unsatisfactory and inconclusive to the judicial mind' the evidence of self-defense may appear. Burns v. State, 229 Ala. 68, 70, 155 So. 561, 562 (1934).
 "However, the court should not instruct on the law of self-defense where there is no evidence to sustain the plea. Raines v. State, 455 So.2d 967, 974
(Ala.Cr.App. 1984); Tarver v. State, 137 Ala. 29, 34 So. 627 (1903); C. Gamble, McElroy's Alabama Evidence, § 457.02(5) (3d ed. 1977). '[I]n the absence of all evidence having a tendency to show that at the time of the killing the accused was in imminent peril of life, or grievous bodily harm, or of the existence of circumstances creating in his mind a reasonable belief of such peril, . . . these instructions were abstract.' King, 71 Ala. at 4-5. A trial judge may properly refuse to charge the jury on self-defense where he determines that `the defendant could not set up self-defense under the facts.' Consford v. State, 15 Ala. App. 627, 634, 74 So. 740, 743, cert. denied, 200 Ala. 23, 75 So. 335 (1917).
 "In determining whether to charge the jury on self-defense, `evidence most favorable to the defendant should be considered and if there is the slightest evidence tending to prove a hostile demonstration which can be reasonably interpreted as placing the accused, at the time of the killing, in apparent imminent danger to life or other grievous bodily harm then the matter of self-defense becomes a question for the jury.' Byrd v. State, 257 Ala. 100, 104, 57 So.2d 388, 391 (1952)."
King v. State, 478 So.2d at 319 (emphasis added). See also Carter v.State, 843 So.2d 812, 813 (Ala. 2002).
The record demonstrates far more than "slight evidence" warranting an instruction on self-defense. Several witnesses testified at trial that Garrigan expressed his intention to "whoop" or "get" Mordecai for a remark he had made to a female bar patron. Several witnesses testified that they warned Mordecai to watch out for Garrigan, because they believed he intended to attack Mordecai. Evidence established that Mordecai had been warned that Garrigan, who was a larger man than Mordecai, was dangerous. The bar's limited space prevented Mordecai from safely retreating from what he testified to be Garrigan's sudden lunge for him. Mordecai testified that it appeared that Garrigan *Page 998 
was prepared to strike him with his fist, and Mordecai testified that he was frightened and perceived that he was in "imminent danger" from the attack.[2]
The record presented ample testimony tending to support Mordecai's claim that he acted in self-defense. Because the evidence was presented, the issue of self-defense should have been submitted to the jury for determination. The trial court eviscerated Mordecai's entire defense when it refused to instruct the jury on self-defense. Because Mordecai presented evidence in support of his self-defense claim, the trial court erred when it refused to give the requested instruction to the jury. This error denied Mordecai a fair trial, and his conviction must, therefore, be reversed and the cause remanded. As our Supreme Court aptly stated decades ago, "However unsatisfactory and inconclusive to the judicial mind, yet there was some proof affording tendencies in support of this plea. The inferences to be drawn therefrom were for the jury, and not the court. We feel impelled therefore to pronounce this action of the court as error to reverse." Burns v. State, 229 Ala. 68, 70, 155 So. 561, 562
(1934).
REVERSED AND REMANDED.
McMILLAN, P.J., and SHAW, J., concur; BASCHAB and WISE, JJ., dissent, without opinion.
[2] The State, in its brief to this Court, notes that Mordecai felt threatened by Garrigan because of his size and because he was worried that Garrigan might aggravate a serious head injury Mordecai had previously suffered. (State's brief at p. 20.) The record indicates that defense counsel attempted to elicit testimony from Mordecai regarding a head injury he had sustained previously and to the effect that death could result if he sustained a blow to the head. (R. 267-68, 297.) The trial court precluded this evidence, although it is not clear to this Court why the testimony was not allowed.
 *Page 71